IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CHRISTOPHER D. SMITH,

                Plaintiff,

v.

JULIE LUDWIG, DR. CHARLES LARSON,
DR. RICHARD STELIGA,
DR. BEATTRICE SUPERVILLE,
JAMES LABELLE, and CINDY O'DONNELL,

                Defendants.

OPINION and ORDER

18-cv-774-jdp

    Plaintiff Christopher D. Smith, appearing pro se, is a prisoner at Fox Lake Correctional Institution (FLCI). Smith contends that prison officials violated his rights by failing to treat his high blood pressure and headaches, which he believes were caused by drinking lead-contaminated water at FLCI. He brings Eighth Amendment claims against several prison and Department of Corrections officials.

    There are two sets of defendants in this case: there is a group of defendants represented by the attorney general's office who I will refer to as the "state defendants," and defendant Beatrice Superville is proceeding separately from this group. Both sets of defendants have filed motions for summary judgment. Dkt. 63; Dkt. 68. I will grant both motions and dismiss the case because Smith fails to show either that the water caused his medical problems or that defendants consciously disregarded his problems.

UNDISPUTED FACTS

    The following facts are undisputed unless otherwise noted. The parties also discuss issues related to this court's previous litigation about contaminants in the FLCI water; I have

included some facts from my summary judgment decision in that case for background purposes. *See Stapleton v. Carr*, 438 F. Supp. 3d 925, 927 (W.D. Wis. 2020).

Plaintiff Christopher Smith has been housed at FLCI since June 2013. Defendants Charles Larson, Richard Steliga, and Julie Ludwig worked at FLCI for at least part of the time that Smith has been incarcerated there. Larson and Steliga were physicians there and Ludwig was a nurse there. Defendant Beatrice Superville was a physician who worked at FLCI on a temporary "locum tenens" basis. Defendant James LaBelle worked as a regional nursing coordinator, with a primary focus on reviewing inmate grievances related to healthcare. Defendant Cindy O'Donnell was a policy initiatives advisor for the Department of Corrections who acted as the DOC secretary's designee for final decisions on appeals of inmate grievances.

Drinking water sometimes contains small amounts of contaminants. Lead is hazardous to human health; according to the National Institute of Environmental Health Sciences, "No blood lead level is safe."[1] The United States Environmental Protection Agency (EPA) states that it "has set the maximum contaminant level goal for lead in drinking water at zero because lead is a toxic metal that can be harmful to human health even at low exposure levels. Lead is persistent, and it can bioaccumulate in the body over time."[2] But that zero-lead goal is not enforced by law. Drinking water regulations set by the EPA establishes "action limits," also known as "maximum contaminant levels," for metals including lead, copper, and arsenic. The action level for lead is 15 parts per billion.

---

[1] National Institute of Environmental Health Sciences, *Lead*, https://www.niehs.nih.gov/health/topics/agents/lead/index.cfm.

[2] United States Environmental Protection Agency, *Basic Information about Lead in Drinking Water*, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water.

Several times between 2008 and 2013, water testing at FLCI showed lead concentrations that exceeded the EPA's action level for lead and other metals. In May 2014, the Department of Corrections entered into a consent order with the Wisconsin Department of Natural Resources (DNR) regarding the water quality at FLCI. Specifically, FLCI agreed to provide "public education" regarding the lead action level exceedances, submit plans for cleaning, flushing, monitoring, and rehabilitation of the wells in the system, and obtain compliance with lead standards. In June 2015, a memorandum was posted in each housing unit stating that elevated levels of lead were found in the drinking water in some of the FLCI buildings, and that people with a variety of medical conditions, including high blood pressure, would be more susceptible to injury from the contaminated water.

The DOC took various efforts to remediate the contaminant problem, and in December 2016 the DNR "closed out" the consent order. After that, the lead test results fell below the action levels, but they were not zero.

Smith believes that the lead in the FLCI water has caused him to have high blood pressure and headaches. In June 2014, defendant Dr. Steliga ordered Smith lisinopril for high blood pressure and he also ordered extensive blood testing. Smith's blood pressure was stable throughout 2015 and was not near dangerous levels. Early in 2015 Smith signed a form refusing blood testing for his vitamin D level.

Steliga saw Smith in early April 2015. Smith's blood pressure was elevated at 137/97, but that is not dangerously high. Smith signed a form refusing his blood pressure medication and other medications in late April, stating, "I no longer need them." Dkt. 71-1, at 2.

On October 20, 2015, defendant Dr. Larson saw Smith for a visit titled "chronic disease clinic." *Id.* at 3. The chronic conditions Smith had were high blood pressure, dyslipidemia,

3

gastroesophageal reflux disease, and dermatitis. Smith reported no significant status changes with his chronic diseases. Smith reported he had not taken his blood pressure medication or other medications for two months and that nurses weren't giving him refills. Larson states that he performed an examination and nothing suggested that Smith was suffering from pain of any kind. Smith disputes this. Larson told Smith to take his prescribed medications. Larson states that Smith mocked him and pressured him to prescribe him narcotic pain medication. Smith denies this. Larson concluded that Smith should keep pain management issues separate from his chronic disease reviews, and he stated that he would request a follow-up appointment with Steliga to discuss pain management. Several days later, defendant Steliga prescribed Smith naproxen for pain and medication for his gastroesophageal reflux disease.

The day after his appointment with Larson, Smith signed a form refusing medications for his high blood pressure and other chronic conditions, stating, "I don't need them." *Id.* at 14. In January 2016 Smith refused the lab work Larson ordered, stating "No reason for labs." *Id.* at 15.

In March 2016 Larson saw Smith for a chronic disease follow up. Larson wanted to discuss Smith's refusals of care. Smith stated, "I'm good" and expressed his belief that he would be fine and did not need to take medication, monitor his blood work, or see the doctor regularly. Smith signed forms refusing further exams and his prescribed medication.

In August 2017, Smith submitted a health service request requesting to be tested for lead in his blood. Defendant Nurse Ludwig responded by stating that he would have to be evaluated for symptoms to determine if a lead test was warranted, and that Smith should submit a new request if he wanted to be evaluated. Smith did not submit such a request. Ludwig did not have the authority to order a blood test herself.

Smith filed an inmate grievance stating that the water caused his "head and body to ache all over." Dkt. 73-1 at 11. The institution complaint examiner recommended dismissing the complaint because "FLCI has never failed a water quality test" and because Smith hadn't submitted a request for an examination of his symptoms as Ludwig had told him to do. *Id.* at 2. Defendant LaBelle adopted the complaint examiner's recommendation and dismissed the grievance. Defendant O'Donnell dismissed Smith's appeal.

In early April 2018, Smith met with defendant Dr. Superville. The parties dispute whether Smith complained about headaches at this appointment. Superville says that Smith did not raise that concern, instead focusing on low back pain. Smith says that he did complain of headaches, and that Superville responded by saying that his headaches were caused by high blood pressure and that she "need[ed] to get [his] blood pressure down first," Dkt. 86, at 1. His blood pressure was 153/106; Superville concluded that his blood pressure was "in poor control." Dkt. 66-1, at 1. Superville increased the dosage of one of Smith's blood pressure medications and added another blood pressure medication.

A week later, Smith met with Superville again. His blood pressure was down to 116/84. The last time Smith saw Superville was in mid-May 2018. Smith's blood pressure was up to 133/94, which Superville considered "not optimal." Dkt. 66-2, at 1. Smith stated that he had not been taking one of his blood pressure medications and that he had missed a few days of his other blood pressure medication. Smith states that at one of these follow-up appointments with Superville, he again complained of headaches, but Superville did not prescribe him pain medication for headaches. Instead she ordered a blood test to check his cholesterol and vitamin levels because his blood pressure remained high.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

I granted Smith leave to proceed on Eighth Amendment claims against defendants for failing to adequately treat the high blood pressure and headaches that he believes were caused by contaminated water at FLCI.

The Eighth Amendment to the United States Constitution prohibits prison officials from consciously disregarding prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

**A. Blood test**

One of the ways that Smith contends defendants violated his rights was by failing to test his blood for lead, which he believes caused his medical problems. He alleges that defendant

Nurse Ludwig denied his request to have his blood tested for excessive lead and that defendant grievance examiners LaBelle and O'Donnell dismissed his grievance about the denial. The parties agree that Smith did not receive a blood test and that LaBelle and O'Donnell dismissed his grievance about it. They dispute whose fault it is that testing never happened. Ludwig says that Smith failed to file a health service request to be seen for any underlying symptoms before a blood test could be ordered, while Smith suggests that Ludwig could have arranged that herself but failed to.

This dispute is ultimately immaterial because Smith fails to show that his underlying health problems were caused by the water at FLCI. Smith is not a medical professional, so he is "not competent to diagnose himself, and he has no right to choose his own treatment." *Lloyd v. Moats*, 721 F. App'x 490, 495 (7th Cir. 2017).

In some medical care cases, it is obvious to a lay person that a plaintiff is correct in blaming a particular cause for his injuries. But in this case, there is no reason for a lay person to think that Smith's headaches or high blood pressure were caused by exposure to lead or other contaminants in the water. Smith would need an expert to make the link between the contaminants and his maladies.

In the past Smith has sought recruitment of counsel in part because expert testimony might be necessary to prove his claims. Smith has not renewed his motion for counsel on this issue, but if even he had, I would deny it. Given the dearth of willing counsel available to take pro bono cases, this court should not recruit counsel "if the plaintiff's 'chances of success are extremely slim.'" *Watts v. Kidman*, 42 F.4th 755, 766 (7th Cir. 2022) (quoting *Maclin v. Freake*, 650 F.2d 885, 887 (7th Cir. 1981). I consider it extremely unlikely that recruited counsel would be able to find an expert drawing a connection between the FLCI water and the

7

seemingly unrelated medical problems that Smith had. And the court has already expended resources by appointing a medical and toxicology expert, Alfred Franzblau, to review the medical records of the numerous plaintiffs proceeding with their individual medical-care cases. *See Stapleton*, Case No. 16-cv-406-jdp, Dkt. 170 (W.D. Wis. Apr. 3, 2020). Franzblau's report does not support Smith's theory. Instead, Franzblau opines that it is unlikely that Smith suffered any acute or chronic toxic effects from the metals that Franzblau considered (arsenic, copper, lead, and manganese). And in particular, he stated that "it is unlikely that any of the 14 inmates [including Smith] has experienced any chronic symptoms or other chronic toxic effects . . . from ingestion of lead in the drinking water at FLCI during the time period in question." Dkt. 53, at 13. He came to this conclusion in large part because "the risk of chronic toxic effects related to lead (such as high blood pressure or cancer) is generally related to cumulative (i.e., many years) or lifetime exposure to lead, and not brief episodes of over-exposure, such as those lasting for a few months, as in the situation at FLCI." *Id*. at 14.

Smith assumes that his medical problems were caused by contaminants in the FLCI water. But his mere speculation that the water caused his injuries is not enough to create a disputed issue of material fact on that issue. *See, e.g.*, *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)). Because Smith fails to show that his underlying health problems were caused by the water, he cannot show that he was harmed by the lack of a blood test. So I will grant summary judgment to defendants on Smith's claim regarding the failure to give him a blood test.

**B. Other medical treatment**

Smith's failure to show that his medical problems were caused by the water is not itself fatal to his Eighth Amendment claims directly about the alleged lack of adequate medical care, because prison medical staff is required to provide prisoners with constitutionally adequate medical care regardless of the underlying cause of a prisoner's maladies. I granted Smith leave to proceed on claims against defendants Steliga, Larson, and Superville for failing to treat his high blood pressure and headaches.

At the summary judgment stage, Smith does not provide evidence suggesting that these defendants failed to treat his high blood pressure; he instead focuses on the alleged lack of treatment for his headaches and nosebleeds. I did not grant Smith leave to proceed on claims about nosebleeds so I will not consider that medical problem further. As for his high blood pressure, Smith's medical records show that defendants indeed attempted to treat it and were successful at least part of the time in doing so. Their efforts to treat him were hampered by his repeated failure to take his blood pressure medications. And the medical record contains multiple healthcare refusal forms bearing his signature showing that he declined those prescriptions. Nothing in the record could lead a reasonable jury to conclude that defendants consciously disregarded his high blood pressure.

Turning to Smith's headaches, defendant Superville argues that Smith fails to show that they were harsh enough to constitute a "serious medical need" under the Eighth Amendment. Smith says little about the severity or regularity of his headaches, but he does call them "bad" and "migraines," so for purposes of this opinion I will consider them a serious medical need. Nonetheless, Smith fails to show that defendants consciously disregarded his problem. Smith

9

says that Steliga and Larson failed to treat his headaches, which is undisputed in the sense that there is no record of them treating his headaches or even noting them as a concern.

But Smith does not present admissible evidence that he raised headaches as a concern in his various meetings with these defendants. For instance, in his various declarations he does not state that he complained of headaches to Steliga or Larson, or explain what their responses to him were. Smith cites only his complaint, in which he states that Larson told him during an October 20, 2015 appointment that he "was not there to see him for high blood pressure or headaches." Dkt. 1, at 5. Smith's complaint is not a sworn statement made under penalty or perjury. And that statement is partially contradicted by the undisputed evidence that Smith indeed met with Larson that day about his high blood pressure as part of a "chronic disease clinic" appointment.

But even if I credited the unsworn statement from Smith's complaint, the record here could not lead a reasonable jury to conclude that Larson disregarded his headaches. Larson's notes show that he thought that Smith's questions about pain should be kept separate from his chronic disease reviews and he stated that he would request a follow-up appointment with defendant Steliga to "review alternative pain management options." Dkt. 71-1, at 12. Steliga prescribed Smith naproxen six days later. Larson's referral of Smith's pain questions to Steliga, who indeed prescribed him pain medication, does not show that either one of the defendants disregarded Smith's headaches. So I will grant the state defendants' motion for summary judgment regarding Steliga and Larson.[3]

---

[3] The state defendants also contend that they are entitled to qualified immunity on Smith's Eighth Amendment claims. Because I am dismissing Smith's claims on the merits, I need not consider the state defendants' qualified immunity arguments.

That leaves defendant Superville, who has filed her own motion for summary judgment. The parties dispute whether Smith complained to Superville about headaches. Superville says that Smith never brought it up. Smith says that he did at his April 9, 2018 appointment, with Superville responding that his "headaches [are] associated with you having high blood pressure" Dkt. 85, at 2, and that she "need[ed] to get [his] blood pressure down first," Dkt. 86, at 1. *See also* Dkt. 92 (Smith's brief), at 1 ("[Smith] was informed by Dr. Superville 'verbatim', that 'your blood pressure is very high and that's what is causing your headaches.'"). Then, at a follow-up appointment, Smith states that Superville ordered a blood test for to check his cholesterol and vitamin levels because his blood pressure remained high.

At the summary judgment stage I must resolve this factual dispute in Smith's favor and assume that Smith complained to Superville about his headaches. But Superville's actions show that she did not disregard Smith's headaches. Rather, she concluded that his headaches could be treated by treating his underlying high blood pressure, and she took steps to treat that problem. I take Smith to be arguing that Superville could also have prescribed pain medication directly for his headaches. But Smith cannot succeed on an Eighth Amendment claim merely by suggesting that Superville could have treated him in a different way; the question here is whether Superville consciously disregarded his headaches. Her decisions to treat his underlying blood pressure as a way of also treating his headaches may or may not have been correct, but there is no evidence that they were so far outside the scope of accepted medical practice that one could infer that her choices indicated her disregard instead of a professional medical judgment. *See Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996). So I will grant Superville's motion for summary judgment.

ORDER

IT IS ORDERED that:

1. Defendant Superville's motion for summary judgment, Dkt. 63, is GRANTED.

2. The state defendants' motion for summary judgment, Dkt. 68, is GRANTED.

3. The clerk of court is directed to enter judgment accordingly and close this case.

Entered March 9, 2023.

                              BY THE COURT:

                              /s/

                              _____
                              JAMES D. PETERSON
                              District Judge